UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ABDALLAH ELSHEIKH, | ) |
| | ) |
| Plaintiff, | ) |
| | )   No. 08 C 1152 |
| v. | ) |
| | ) |
| MICHAEL CHERTOFF, as Director | )   Judge Kennelly |
| of the Department of Homeland Security, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

**Introduction**

The dockets of federal courts have become increasingly crowded with applicants for immigration benefits seeking the assistance of the judiciary in moving their cases through the immigration system. The numbers of these mandamus cases have increased in a "post 9/11-world" in which the federal agencies entrusted with ensuring that the requirements for immigration benefits are complied with have had to process a dramatically increased number of security checks through an already overburdened system. As the number of mandamus cases has increased, so too has the concern of the judiciary. For example, Judge Shadur in denying a government's motion to dismiss, cited the "endless stream of cases seeking the adjudication of applications for naturalization, all stemming from the appalling failure of the FBI to conduct and complete countless background checks of such applicants." *El Masri v. Dorchoff,* 2008 WL 515507, at *1 (N.D. Ill. February 25, 2008). This court, as well, has also expressed its concerns with the background check process. *He v. Chertoff,* 528 F.Supp.2d 879 (N.D. Ill. 2008).

In response to these cases and others, the FBI and USCIS have recently undertaken specific, concrete steps are being taken to eliminate the backlog and dramatically improve the pace at which security checks are performed with the backlog problem. It is also important to note that this case

is different from the overwhelming numbers of other immigration mandamus cases that appear on the dockets of this district. This plaintiff, Abdallah Elsheikh, asks the court to be the first in this district to take the step of forcing U.S. Citizenship and Immigration Services to adjudicate his naturalization application even though Elsheikh has not yet been interviewed. USCIS has not interviewed Elsheikh because it has not yet received the results of his FBI background check. Immigration statutes and regulations prevent USCIS from acting on *any* naturalization petition until it has received the results of the FBI's background check. Furthermore, the FBI is acting reasonably in processing Elsheikh's background check in light of the amount of checks requested, the available technology, and the steps taken to prevent such future backlogs.

## Statement of Facts

Plaintiff Abdallah Elsheikh, a native and citizen of Lebanon, has been a lawful permanent resident of the United States since 2001. Rule 56.1 Statement, ¶ 5. In August 2006, Elsheikh and his wife, Rola, submitted applications for U.S. citizenship with the USCIS Nebraska Service Center along with information for purpose of conducting a background check. *Id.*, ¶ 6.

**USCIS Process for Naturalization Application**

After a naturalization application is filed, to ensure that the applicant is eligible and not a risk to national security or public safety, USCIS conducts: (1) security and background checks in its own records systems, (2) an FBI fingerprint check for relevant criminal history records on the applicant, (3) a check against the DHS-managed Interagency Border Inspection System ("IBIS") containing records and "watch list" information from more than twenty federal law enforcement and intelligence agencies, and (4) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS. *Id.*, ¶¶ 7-8.

These checks have revealed significant derogatory information on some USCIS applicants, including applicants seeking naturalization, and have resulted in USCIS's denial of applications and

in some cases removal from the United States. *Id.*, ¶ 9. The disqualifying information is not always obtained via fingerprint check but is often discovered as a result of the IBIS or FBI name checks. *Id.*, ¶ 10. Only after all the checks are complete is the applicant scheduled for an in-person interview in the USCIS district office with jurisdiction over his place of residence. *Id.*, ¶ 11. After the interview, the application is adjudicated by a district officer and, if approved, the applicant is then scheduled for the next available oath ceremony. *Id.*, ¶ 12.

USCIS audits its cases in which the pending FBI name check is the only impediment to final adjudication on a weekly basis in order to identify those in which a response from the FBI has been received, and once completed, the case is forwarded to the district office for interview. *Id.*, ¶ 18.

A complete FBI criminal background investigation is needed before any application for naturalization can be adjudicated by USCIS. *Id.*, ¶ 19. Elsheikh's name-check request was electronically submitted to the FBI one week after his application was filed and the application remains pending because his background and security check has not been completed by the FBI. *Id.*, ¶¶ 20-21. Elsheikh has not been scheduled for an interview by USCIS regarding his application. *Id.*, ¶ 22. Elsheikh's wife, Rola, had her background completed, application granted, and was naturalized in June 2008. *Id.*, ¶ 23. Elsheikh holds a lawful permanent resident card allowing him to lawfully work in the United States and to return from travel abroad while his application is pending. *Id.*, ¶ 24.

**The FBI Conducts Background Checks for USCIS**

The FBI's National Name Check Program ("Program") disseminates information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, foreign police and intelligence agencies, and state and local criminal justice agencies. *Id.*, ¶ 25. The Program mandates National Agency Checks as part of the pre-employment vetting and background investigations for prospective government employees, as well as the primary National Agency Checks conducted on all United States government employees

and requests for background information from FBI files on individuals before bestowing a privilege, such as government employment or appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. *Id.*, ¶ 26.

When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index, searching for instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference file. *Id.*, ¶ 29.[1] Names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and others, and are searched phonetically against the Universal Index records. This process retrieves similar spelling variations, which is especially important considering that many names in FBI indices have been transliterated from a language other than English. *Id.*, ¶ 30. If there is a match with a name in a FBI record, it is designated as a "hit," meaning that the system has stopped on a possible match with the name being checked, and if a search comes up with a match to a name and either a close date of birth or social security number, it is also flagged. *Id.*, ¶ 31.

There are four stages involved in the completion of an individual name check. *Id.*, ¶ 32. First, the name-check requests are electronically checked against the FBI's Universal Index. *Id.*, ¶ 33. During this batch stage, approximately 66 percent of the name checks submitted by USCIS are returned within 48-72 hours as having "no record," indicating that the FBI has no identifiable information regarding a particular individual and concludes that particular request. *Id.*, ¶ 34.

The next stage involves an expanded manual name search for those remaining name-check requests during which the FBI physically enters the applicant's name into the computer database searching different fields and information, which historically identifies an additional 17 percent of the USCIS requests as having "No Record" and they are also returned to USCIS. *Id.*, ¶ 35.

---

[1] Any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation.

The next two stages in the process involve USCIS requests remaining after name searching has identified a request as possibly being the subject of an FBI record that an analyst reviews and compares to FBI records. *Id.*, ¶¶ 36-37. The relevant information is retrieved through the file review process from an existing paper record that is reviewed by an analyst for possible derogatory information. *Id.*, ¶ 38. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information and the FBI forwards a summary of the derogatory information to USCIS. *Id.*

A name check may also occasionally undergo additional electronic or manual searches depending on the length of time the name check has been pending processing. *Id.*, ¶ 39. It is not uncommon for a name check to remain pending in the final stage until the analyst has up-to-date information prior to completing and disseminating a name-check result. *Id.*

At each stage of processing, the FBI generally uses a first-in, first-served protocol, reflecting a policy that all applicants are equally deserving and ensures that all applicants are treated fairly. *Id.*, ¶ 40. However, if an applicant's name check requires a review of numerous FBI records and files, even though that name-check request came in first, the name check may require additional time until all responsive records can be located and reviewed. *Id.*

Sometimes, a name check will be handled on an "expedited" basis as determined by USCIS and that request proceeds toward the front of the line based on a USCIS assessment regarding its priorities and generally to minimize possible health and welfare harm to applicants that may arise. However, the FBI limits the number of expedite requests it will accept from USCIS consistent with available resources and personnel, currently 100 per week. *Id.*, ¶ 42.

**Since 9-11-01, Requests for Background Checks Have Increased**

Prior to September 11, 2001, the FBI processed approximately 2.5 million name-check requests each year, but as a result of counterterrorism efforts, the number of name checks has grown to more 4 million in fiscal 2007. *Id.*, ¶ 43. Most of the name checks submitted to the FBI over the

past few years were submitted by USCIS and from 2003 to 2007, USCIS submitted about 10.9 million requests for name checks to the FBI. *Id.*, ¶ 44.

In November 2002, heightened national security concerns prompted the FBI to check its reference files in addition to the main files. *Id.*, ¶ 45. Also starting in late 2002, INS re-submitted 2.7 million name-check requests that did not already have reference file checks, a process that resulted in more than 440,000 (16%) of the re-submitted requests with positive "hits" (possible match in an FBI record). *Id.* These re-checks were completed by spring 2008. *Id.*, ¶ 46.

The number of "hits" on a name also contributes to the delay in processing a request. *Id.*, ¶ 48. Common names also contribute to delay in processing because those requests are searched in a multitude of combinations, and without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records; common names can often have more than 200 hits on FBI records. *Id.*, ¶ 49.

The accessibility of the FBI records needed for review also contributes to a delay in processing a name-check request. *Id.*, ¶ 50. Paper records predating October 1995 are kept in more than 265 possible location across the country. *Id.* A single name check may involve locating and reviewing numerous files, all at different physical locations that must be communicated internally to the field, and handled according to the current priorities of the particular field office: a paper-based, time consuming, and labor intensive process. *Id.*, ¶ 51.

**The FBI Is Making Its Records More Retrievable and Accessible**

To prevent future backlogs, the FBI is developing a name check dissemination database to eliminate manual and duplicate preparation of reports to other agencies, and provide avenues for future automation of the name check process. *Id.*, ¶ 52. Currently, the FBI is utilizing employee overtime, hiring additional employees to fill current vacancies, and using an employee development program to streamline the training of new employees decreasing the amount of time needed before

a new employee can begin to significantly impact the workload. *Id.*, ¶ 54. In addition, the FBI has started scanning its paper files to provide machine readable documents for the database, and it is also building an electronic records system that allows for future automation of the name-check process. *Id.*, ¶ 55. The FBI is also creating a central repository of records that will alleviate the need to retrieve records stored at the 265 locations throughout the FBI, thereby expediting access to information contained in billions of documents that are currently stored in locations throughout the United States and the world. *Id.*, ¶ 56.

In addition, in April of this year, the FBI and USCIS announced a joint business plan which is designed to dramatically reduce the delays associated with completing name checks. Under the joint plan, the FBI states that the USCIS name check backlog will be eliminated by June 2009, and the FBI will meet the USCIS target performance of processing 98% of all incoming name checks within 30 days and the balance within 90 days. *Id.*, ¶ 58. The target for processing all USCIS name checks pending over one year is November 2008. *Id.* The two agencies have allocated substantial additional resources to accomplishing these goals, including more than $34.5 million for additional personnel and improvements to information technology. *Id.*, ¶ 59.

The FBI is sensitive to the impact of the delays in processing name-check requests, but the possible consequences of the FBI's mission on homeland security requires that its name-check process be primarily focused on providing accurate and thorough results. *Id.*, ¶ 60. The FBI cannot provide a specific time frame for completing any particular USCIS name check. *Id.*, ¶ 57. The processing time depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of expedited name checks the analyst must process for, among others, military deployment, sunset provisions such as Diversity Visa cases, compelling reasons such as critical medical conditions, and loss of social security or other subsistence; the number of "hits" that must be retrieved, reviewed and resolved; the number of records from various field offices that must be retrieved, reviewed and

resolved; and, more generally, the staff and resources available to conduct the checks. *Id.* The FBI software does not report where in the processing queue a particular name-check request may lie. *Id.*

When the name check is completed, the FBI provides the results to USCIS as quickly as possible. *Id.*, ¶ 61. The FBI does not publicly disclose name-check results or any underlying "hits," because to do so could alert plaintiffs and/or other individuals to the existence of pending investigations, thus potentially compromising those investigations, confidential sources or investigative techniques. *Id.*, ¶ 62.

**Elsheikh's Background Check Is Pending**

The name-check request for Elsheikh was received by the FBI on or about August 18, 2006, and has not been completed. *Id.*, ¶ 63. Elsheikh's name check is pending in the processing queue and the FBI is performing his name check in response to USCIS's request in accordance with the procedures outlined above. *Id.* The name-check request for Rola Elsheikh was received by the FBI from USCIS on or about August 18, 2006, and was completed on November 25, 2007, also having been performed in accordance with the procedures outlined above. *Id.*, ¶ 64.

**Argument**

**1.      Summary Judgment**

Summary judgment is appropriate if the evidence provided the court shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The evidence must be viewed in the light most favorable to the party opposing the motion. *Kizer v. Children's Learning Center*, 962 F.2d 608, 611 (7th Cir. 1992).

When the non-moving party bears the burden of proof on an issue, that party may not rest on the pleadings and must instead produce evidence showing a genuine issue of material fact. *Vanasco v. National-Louis University*, 137 F.3d 962, 965 (7th Cir. 1998). A party seeking to defeat

a motion for summary judgment is required to "wheel out all its artillery to defeat it," *Employers Ins. of Wausau v. Bodi-Wachs Aviation Ins. Agency*, 846 F.Supp. 677, 685 (N.D. Ill. 1994), and may not merely allege in a general or conclusory fashion that issues of fact exist or might exist. Federal Rule of Civil Procedure 56(e); *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 378 (7th Cir. 1998).

A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole. *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 950 (7th Cir. 2000). Finally, the plaintiff is required to present evidence upon which he bears the burden of proof at trial once the absence of evidence is identified by the defendant moving for summary judgment. *National Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264 (7th Cir. 1996).

**2.     The District Court Lacks Jurisdiction to Directly Adjudicate Elsheikh's Naturalization Application.**

Under 8 U.S.C. § 1446(a), Congress requires USCIS to conduct a personal investigation of applicants for naturalization. Through a funding statute passed in 1997, Congress required USCIS to await the completion of FBI criminal background checks before adjudicating an application for naturalization. Pub. L. No. 105-119, Title I, Nov. 26, 1997, 111 Stat. 2448. Accordingly, in 1998, 8 C.F.R. § 335.2 was amended to require that USCIS await the completion of the FBI investigations before conducting the initial interview of an applicant.

This is the procedure that has been followed in Elsheikh's case. He is awaiting an interview which will be held *after* his background check has been completed. This makes this situation distinct from applicants who can invoke 8 U.S.C. § 1447(b) which provides jurisdiction for court when more than 120 days have passed *after* the interview without agency action. Elsheikh cannot invoke this provision because he has not yet been interviewed. Moreover, USCIS cannot be compelled to grant Elsheikh an interview on his petition until the background check is completed. To do so would require USCIS to perform an action contrary to law.

To prevail on his mandamus claim under 28 U.S.C. § 1361, Elsheikh must first demonstrate that: "(1) he has a clear right to the relief sought; (2) the defendant has a duty to do the act in question; and (3) no other adequate remedy is available." *Iddir v. INS*, 301 F.3d 492, 499 (7th Cir. 2002) (citing 28 U.S.C. § 1361). Mandamus relief is a "drastic and extraordinary remedy reserved for really extraordinary causes," and the issuing court "in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court for Dist. of Columbia,* 542 U.S. 367, 380-81 (2004); *Miller v. French*, 530 U.S. 327, 339 (2000) ("mandamus is an extraordinary remedy that is 'granted only in the exercise of sound discretion'").

Because the statute and the regulation enacted pursuant to statute require completion of the FBI background check before scheduling a naturalization interview and Elsheikh's background check has not been completed, Elsheikh has no clear right to relief from USCIS and USCIS has no duty to do the act in question. Thus, Elsheikh is precluded from obtaining mandamus relief.

**3.      There is No Duty on Behalf of the FBI to the Plaintiff to Expedite his Name Check.**

Lacking the jurisdiction to command USCIS to adjudicate his petition, Elsheikh is seeking to have his FBI background check expedited since USCIS is precluded from interviewing him until after his FBI background check has been completed. The decisions rejecting Elsheikh's position that there is jurisdiction to order the FBI to more quickly complete a name check in a naturalization case have been called "too numerous to reprint." *Antonishin v. Keisler*, 2007 WL 2788841, at *6 (N.D. Ill. September 20, 2007) ("We conclude that plaintiffs have not stated a claim for APA relief against the FBI."); *Hussain v. Mueller*, 2008 WL 2557565, at *3 (S.D. Tex. June 20, 2008) (FBI has no clear duty to expedite background check for naturalization applicant); *Yan v. Mueller*, 2007 WL 1521732 (S.D. Tex. May 24, 2007) (noting Congress has not imposed a deadline for the FBI to complete name check investigation and finding that the pace required to complete that investigation is not subject to review under mandamus and the APA); *Shalabi v. Gonzalez*, 2006 WL 3032413, at *5 (E.D. Mo. Oct. 23, 2006) (finding plaintiff could not establish that the FBI owes him a clear,

10

nondiscretionary duty as no statute or regulation imposes a deadline for the FBI to complete a criminal background check); *Elsayed v. Gonzales*, 2007 WL 2792453, at *2-3 (D. Col. Sept. 25, 2007) (finding "overwhelming case law that there is no jurisdiction over the FBI in name check cases"); *Sinha v. Upchurch*, 2007 WL 4322225, at *4 (N.D. Ohio Dec. 7, 2007) ("Upon review, the Court finds that it lacks jurisdiction over the FBI Defendants because they do not owe plaintiff a nondiscretionary duty to process background checks."); *Repeshchuk v. Gonzales*, 2007 WL 3275114, at *1 n.2 (D. Minn. Nov. 1, 2007) ("To the extent Plaintiff argues that the Court enjoys the authority to order the FBI to expedite a name check because it has been named a defendant in this action, he is incorrect."); *Musaad v. Mueller*, 2007 WL 3046476, at *5 (S.D. Ohio Oct. 16, 2007) (holding it "inappropriate to issue an Order requiring the FBI to expedite the background check. First, the text of Section 1447(b) does not clearly authorize this Court to do so.")

The court can order mandamus or APA relief *only* where the agency owes a "clear, nondiscretionary duty," *Pittston Coal Group v. Sebben*, 488 U.S. 105, 121 (1988), or in the context of the APA, an "action legally required." *Norton v. So. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004). Elsheikh cannot offer any legal basis to support the proposition that the FBI owes him a duty to complete his background check. Many courts that have analyzed whether such a duty exists have found that it does not. *See Antonishin*, 2007 WL 2788841 at *6.

Some courts have inferred such a duty from the fact that Congress prohibited USCIS action to naturalize applicants without a completed FBI background check, Pub. L. No. 105-119 (discussed above) and from the fact that it authorized the FBI to establish fees for name check costs. Pub. L. No. 105-515, 104 Stat. 2101, 2112 (1990). *See e.g., Kaplan v. Chertoff*, 481 F.Supp. 2d 370 (E.D. Pa. 2007).[2] But the court in *Antonishin* correctly observed that "it is at best unclear whether

---

[2] Another court has recently found that USCIS' interpretation of the name check requirement violated the APA's notice and comment requirement. *Mocanu v. Mueller,* 2008 WL 372459 (E.D. Pa., February 8, 2008). This finding was directly addressed and rejected by the court in *Antonishin*, 2007 WL 278841 at *7-8, finding that USCIS was *interpreting* the term "full criminal background check" and not creating a "new law, right or duty," *citing, Metropolitan School Dist. of Wayne Twp.,*

11

Congress intended to impose any mandatory duty on the FBI" and declined to "infer such a duty based on the appropriations measures directed to a different agency." *Antonishin*, 2007 WL 2788841 at *6. Congress could have expressly imposed such a duty upon the FBI and the fact that it did not is particularly significant here, where the court may grant relief by way of mandamus or the APA only where it finds that the plaintiff is owed a "*clear*, nondiscretionary duty" or "legally required action."

Given the subject matter involved, there cannot be any duty for the FBI to complete a background check within a particular deadline. Accordingly, mandamus is unavailable because the FBI already is taking action and Elsheikh "simply wishes to force [defendants] to [act] in a more expeditious manner." *Mustafa v. Pasquerell*, 2006 U.S. Dist. LEXIS 8047, *15 (W.D. Tex. Jan. 10, 2006), *citing Norton v. So. Utah Wilderness Alliance,* 542 U.S. 55, 61 (2004). It is not desirable for courts to impose arbitrary deadlines upon the FBI in naturalization cases because "[a] background check that is rushed or incomplete due to an artificial court imposed deadline would not meet the statutory and regulatory requirements of a 'full criminal background check' before the USCIS can make a determination on an application." *Shalabi*, 2006 WL 3032413 at *5.

In addition, defendants continue to address the backlog of background checks and they are generally processed on a first-in, first-out basis. Rule 56.1 Statement, ¶ 40. Courts have been reluctant to find that such a process violates the undue delay standard. *Liberty Fund, Inc. v. Chao*, 394 F.Supp. 2d 105, 116-117 (D.D.C. 2005) (denying such a claim against the Department of Labor for backlog processing of employer applications for permanent labor certifications on behalf of aliens).

**4.     Elsheikh Has Failed to Establish That the Delay He Has Experienced Is Unreasonable.**

Even if Elsheikh could establish that the federal defendants have a legal obligation to expedite his naturalization application — which he cannot — Elsheikh's claims must also fail

---

*Marion County, Ind. v. Davila,* 969 F.2d 485, 490 (7th Cir. 1992).

12

because he has failed to establish that any delay which he has experienced is so unreasonable that his application by law has to be moved to the front of the pack. Complaint ¶¶ 9-14; *see also Telecommunications Research Action Ctr. v. FCC,* 750 F.2d 70, 80 (D.C. Cir. 1984). The Supreme Court has recognized that "judicial deference to the Executive Branch is especially appropriate in the immigration context." *INS v. Aguirre-Aguirre,* 526 U.S. 415, 425 (1999). "[M]odesty is the best posture for the branch that knows the least about protecting the nation's security and that lacks the full kit of tools possessed by the legislative and executive branches." *Rahman v. Chertoff*, 2008 WL 2521699, *5 (7th Cir. June 26, 2008). In light of their important work and the complex nature of their missions, the investigative agencies involved in this case should be given broad discretion to do their work.

The shrinking backlog of name checks applies to a small number of the overall USCIS applications (less than 10 percent pending more than 33 months). Rule 56. 1 Statement, ¶ 14. In addition, the FBI must use limited resources to complete the background checks required not only for Elsheikh, but also for other naturalization applicants and other individuals. *Id*. As a result of the increased need for background checks post-9/11, a resource strain has been placed on the FBI. "[W]here resource allocation is the source of the delay, courts have declined to expedite action because of the impact of competing priorities." *Liberty Fund*, 394 F.Supp. 2d at 117. Even in the face of a statutory deadline (something *not* present here), moving some individuals to the front of the queue has not been authorized by the courts because granting such relief for one group of petitioners would simply move that group ahead of others who had also been waiting, resulting in no net gain in processing. *See In re Barr Lab.,* 930 F.2d 72, 75 (D.C. Cir. 1991); *Mashpee Wamponoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1101 (D.C. Cir. 2003). Given the limited resources, the federal defendants have prioritized the processing of name checks in a

reasonable and entirely legal manner consistent with the resources at their disposal.  *See Liberty Fund,* 394 F.Supp. 2d at 117; *In re Barr Lab,* 930 F.2d at 75; *Mashpee Wampanoag Tribal Council*, 336 F.3d at 1101.  Furthermore, over the past several months, the FBI and USCIS have entered into a business plan which will dramatically reduce the backlogs involved in the name check process.

     While this may not be a prefect system, perfection is not the standard that courts are to apply when addressing mandamus petitions.  Instead the courts are to interfere as a last resort only in cases in which the law gives them authority to do so.  Mandamus is a drastic and extraordinary remedy and courts are not to intervene merely because a plaintiff is able to critique, criticize, or Monday-morning quarterback the way the executive branch addresses this difficult and thankless task.  The issue is not whether a plaintiff can suggest that there is a better way to do things.  Instead the focus of the inquiry is to be whether this system has operated so unfairly towards the applicant that the courts are required by law to step in and push him ahead of the others who are waiting in line.

     This is not a case of a grievous miscarriage of justice that requires judicial intervention.  The factors which have contributed to the delays in processing name-check requests present a difficult problem that the FBI and USCIS are taking concrete action to resolve.  Rule 56.1 Statement, ¶ 53-56, 58.  Despite these problems, the application for Elsheikh's wife that was submitted the same day has been granted, further showing that the delay is not unreasonable but rather must be caused by the legitimate concerns for which the background requirement was enacted.  The inconvenience which Elsheikh has experienced is shared by all of those who are waiting with him.  Elsheikh is free to work and travel within the United States as a lawful permanent resident.  The biggest reason that there are delays for citizenship is that citizenship itself is a privilege for which there is great demand.  While everyone, including the federal defendants, would like the system to operate faster (and it is),

gaining speed in the process should not come at the cost of subverting a system that is designed to protect our national security and other interests. Letting the system operate in a reasonable manner is certainly preferable to sending the message to all naturalization applicants that the only thing you have to do to butt into the front of the line is hire a lawyer and file a mandamus petition. Such a message will certainly engender an endless stream of necessary litigation.

## Conclusion

For the foregoing reasons, this court should grant summary judgment in favor of the defendants.

                                  Respectfully submitted,

                                  PATRICK J. FITZGERALD
                                  United States Attorney

                                  By:  s/ James M. Kuhn, Sr.
                                      JAMES M. KUHN, SR.
                                      Assistant United States Attorney
                                      219 South Dearborn, Room 500
                                      Chicago, Illinois 60604
                                      (312) 353-1877
                                      james.kuhn @ usdoj.gov