# Government Exhibit A

TG

**FILED**

**FEBRUARY 25, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

ABDALLAH EL SHEIKH,     )
ROLA ELSHEIKH     **Plaintiff,** )
v.             )
              )
              )
MICHAEL CHERTOFF,     )
AS THE DIRECTOR OF     )
THE DEPARTMENT OF HOMELAND )
SECURITY, ROBERT S. MUELLER, III )
AS THE DIRECTOR OF FEDERAL   )
BUREAU OF INVESTIGATIONS   )
              )
**Defendant**         )

No.:

A# 029 222 864
A# 077 828 638

08 C 1152

JUDGE KENNELLY
MAGISTRATE JUDGE ASHMAN

## <u>COMPLAINT FOR MANDAMUS</u>

  Plaintiffs, ABDALLAH ELSHEIKH ("Abdullah") and ROLA ELSHEIKH ("Rola"), by and through, REEM H. ODEH, of the LAW OFFICES OF BRODSKY & ODEH respectfully requests this Court to enter an order directing the Defendant, MICHAEL CHERTOFF, Director of Homeland Security and ROBERT S. MUELLER III, as Director of Federal Bureau of Investigations to adjudicate Plaintiffs' application for Naturalization. In support of said request, the Plaintiffs state as follows:

### JURISDICTION AND VENUE

1.   The is a civil action brought pursuant to 8 U.S.C. section 1329, and 28 U.S.C. Sections 1331 (Federal Questions) because Plaintiffs' claims arise under the federal laws of the United States, and 1361 (Mandamus Act), and Section 1447(b) to redress the deprivation of rights, privileges and immunities secured to Plaintiff, by which statutes jurisdiction is conferred, to compel Defendant to perform a duty Defendant owes to Plaintiff, 5 U.S.C. section 704 also confers jurisdiction, 28 U.S.C §2201 (Declatory Judgement Act) and under 5 U.S.C. §701 *et seq.* (Administrative Act of the "APA").

2.   Venue is proper under 28 U.S.C. section 1391(b), since Defendant is the Director of the Bureau of Citizenship and Immigration Services (BCIS), an agency of the United States Government, under the Department of Homeland Security. The Defendant Robert S. Mueller III, is the Director of the federal Bureau of Investigations.

3.   This action is brought to compel the defendant, officers and an agency of the United States, to perform its duties arising under the laws of the United States.



GOVERNMENT
EXHIBIT
**A**

4.      The APA requires USCIS and the FBI to carry out their duties within a reasonable time. The provision of the APA that provides this is 5 USC Sec. 555(b), which states that "with due regard for the convenience and necessity of the parties or their representaives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." USCIS and FBI are subject to 5 USC Sec. 555(b).  The Plaintiffs contend that the delays in prpocessing their applications for naturalization are unreasonable.

## PARTIES

5.      Plaintiff Abdallah Elsheikh is a 43 year old native and citizen of Lebanon.  He became a Legal Permanent Resident on October 9, 2001.  Plaintitff Rola Elsheik is a 35 year old citizen of Lebanon and became a Legal Permanent Resident on October 9, 2001.  Plainitffs Abdallah Elsheikh and Rola Elsheik are married.

6.      Plaintiff Abdallah's alien number is A029-222-864.  Plaintiff Rola's alien number is A077-828-638.

7.      Defendant, MICHAEL CHERTOFF, is the Director of the Department of Homeland Security.  As such, he is charged with the duty of administration and enforcement of all the functions, powers, and duties of Bureau of Citizenship & Immigration Services, the former INS. The Defendant ROBERT S. MUELLER III, is the Director of the Federal Bureau of Investigations.

8.      That Robert Mueller is sued in his official capacity.  The FBI is responsible for the proper background clearance conducted on each applicant for naturalization.

## CLAIMS FOR RELIEF

9.      On August 14, 2006, Plaintiffs filed their applications for Naturalization and paid the appropriate filing fees and submitted all the required documentation.

10.     On August 26, 2006, Plaintiffs appeared before the Citizenship and Immigration Services service center to have their fingerprints and biometrics taken as part of the naturalization process.

11.     That since the filing of the Application for Naturalization which was filed on August 14, 2006 the Plaintiffs have never been scheduled to appear for a Naturalization interview. Furthermore, no word has been forthcoming since the interview except that the plaintiffs' "background checks" remain pending and no proper communication was received relative to the applications for naturalization.

12.     Prior to the filing of this Complaint, the Plaintiffs have made numerous attempts with the Defendants to inquire about the status of their applications. The Plaintiffs and their attorney have also made numerous oral and written requests of the Defendant concerning the scheduling of an interview for naturalization. No further action was taken by Defendants in this matter.

13.    The Defendants, in violation of the Administrative Procedure Act, are unlawfully withholding or unreasonably delaying a decision on the applications of Plaintiffs.

14.    Plaintiffs have exhausted any remedies that may be exist.

WHEREFORE, Plaintiffs prays that the Court, in light of the foregoing:

A.    Compel Defendant and those acting under him to perform their duty to rule upon the Plaintiff's applications;

B.    Compel the Federal Bureau of Investigation to complete their background and fingerprint process.

B.    Grant attorney's fees and cost of court

C.    Grant such other and further relief as this Court sees proper under the circumstances.


Respectfully Submitted,


_____/s/ Reem H. Odeh_____
Reem H. Odeh
Attorney for Plaintiffs



**Reem H. Odeh**
**Brodsky & Odeh**
8 S. Michigan, Suite 3200
Chicago, Illinois 60603
312-701-3000
312-701-3088(fax)

# Government Exhibit B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ABDALLAH ELSHEIKH and )
ROLA ELSHEIKH, )
)
Plaintiffs, )        No. 08 C 1152
)
v. )
)        Judge Kennelly
MICHAEL CHERTOFF, as Director )
of the Department of Homeland Security, )
)
Defendant. )

## ANSWER

The defendants, by Patrick J. Fitzgerald, United States Attorney for the Northern District of

Illinois, answer the complaint for writ of mandamus as follows:

### First Defense

This court lacks subject matter jurisdiction over the complaint.

### Second Defense

The complaint fails to state a claim upon which relief can be granted.

### Third Defense

Relief should be denied plaintiffs as an exercise of judicial discretion to withhold relief.

Defendants respectfully submit that even if the court is empowered to act, this is not an appropriate

case for the court to engage in the business of reordering agency priorities, or jeopardize national

security or the public safety by ordering the application of plaintiffs to be adjudicated out of order

thereby prejudicing the numerous individuals who met the requirements for naturalization before

him and who are waiting to have their case adjudicated.


GOVERNMENT
EXHIBIT
B

### Fourth Defense

Answering the specific allegations of the complaint, and using the same paragraph numbering, the defendants admit, deny, or otherwise aver as follows:

### JURISDICTION AND VENUE

1.    The is a civil action brought pursuant to 8 U.S.C. section 1329, and 28 U.S.C. Sections 1331 (Federal Questions) because Plaintiffs' claims arise under the federal laws of the United States, and 1361 (Mandamus Act), and Section 1447(b) to redress the deprivation of rights, privileges and immunities secured to Plaintiff, by which statutes jurisdiction is conferred, to compel Defendant to perform a duty Defendant owes to Plaintiff, 5 U.S.C. section 704 also confers jurisdiction, 28 U.S.C §2201 (Declatory Judgement Act) and under 5 U.S.C. §701 et seq. (Administrative Act of the "APA").

> *Answer*:  Defendants admit plaintiffs allege jurisdiction as stated but deny the
>
> allegations contained in paragraph one of the complaint.

2.    Venue is proper under 28 U.S.C. section 1391(b), since Defendant is the Director of the Bureau of Citizenship and Immigration Services (BCIS), an agency of the United States Government, under the Department of Homeland Security. The Defendant Robert S. Mueller III, is the Director of the federal Bureau of Investigations.

> *Answer*:  Defendants admit the allegations contained in paragraph two of the
>
> complaint.

3.    This action is brought to compel the defendant, officers and an agency of the United States, to perform its duties arising under the laws of the United States.

2

*Answer*:  Defendants admit this paragraph states the relief sought as alleged by

plaintiffs but deny the allegations contained in paragraph three of the

complaint.

4.    The APA requires USCIS and the FBI to carry out their duties within a reasonable

time. The provision of the APA that provides this is 5 USC Sec. 555(b), which states that "with due

regard for the convenience and necessity of the parties or their representaives and within a

reasonable time, each agency shall proceed to conclude a matter presented to it." USCIS and FBI

are subject to 5 USC Sec. 555(b). The Plaintiffs contend that the delays in processing their

applications for naturalization are unreasonable.

*Answer*:  Defendants admit the allegations contained in paragraph four of the

complaint.

### PARTIES

5.    Plaintiff Abdallah Elsheikh is a 43 year old native and citizen of Lebanon. He

became a Legal Permanent Resident on October 9, 2001. Plaintiff Rola Elsheik is a 35 year old

citizen of Lebanon and became a Legal Permanent Resident on October 9, 2001. Plainitffs Abdallah

Elsheikh and Rola Elsheik are married.

*Answer*:  Defendants admit the allegations contained in paragraph five of the

complaint.

6.    Plaintiff Abdallah's alien number is A029-222-864. Plaintiff Rola's alien number

is A077828-638.

*Answer*:  Defendants admit the allegations contained in paragraph six of the

complaint.

3

7.      Defendant, MICHAEL CHERTOFF, is the Director of the Department of Homeland Security.  As such, he is charged with the duty of administration and enforcement of all the functions, powers, and duties of Bureau of Citizenship & Immigration Services, the former INS. The Defendant ROBERT S. MUELLER III, is the Director of the Federal Bureau of Investigations.

*Answer*:  Defendants admit the allegations contained in paragraph seven of the complaint.

8.      That Robert Mueller is sued in his official capacity.  The FBI is responsible for the proper background clearance conducted on each applicant for naturalization.

*Answer*:  Defendants admit the allegations contained in paragraph eight of the complaint.

**CLAIMS FOR RELIEF**

9.      On August 14, 2006, Plaintiffs filed their applications for Naturalization and paid the appropriate filing fees and submitted all the required documentation.

*Answer*:  Defendants admit plaintiffs filed applications for naturalization and paid the filing fees and deny knowledge or information sufficient to form a belief as to the truth the matters asserted in the remainder of paragraph nine of the complaint.

10.      On August 26, 2006, Plaintiffs appeared before the Citizenship and Immigration Services service center to have their fingerprints and biometrics taken as part of the naturalization process.

*Answer*:  Defendants admit the allegations contained in paragraph ten of the complaint.

4

11.     That since the filing of the Application for Naturalization which was filed on August 14, 2006, the Plaintiffs have never been scheduled to appear for a Naturalization interview. Furthermore, no word has been forthcoming since the interview except that the plaintiffs' "background checks" remain pending and no proper communication was received relative to the applications for naturalization.

*Answer*:   Defendants admit plaintiffs have not yet been scheduled for an interview but deny that their background checks have not been completed, and deny the remaining allegations contained in paragraph eleven of the complaint.

12.     Prior to the filing of this Complaint, the Plaintiffs have made numerous attempts with the Defendants to inquire about the status of their applications.  The Plaintiffs and their attorney have also made numerous oral and written requests of the Defendant concerning the scheduling of an interview for naturalization. No further action was taken by Defendants in this matter.

*Answer*:   Defendants deny knowledge or information sufficient to form a belief as to the truth the matters asserted in paragraph twelve of the complaint.

13.     The Defendants, in violation of the Administrative Procedure Act, are unlawfully withholding or unreasonably delaying a decision on the applications of Plaintiffs.

*Answer*:   Defendants deny the allegations contained in paragraph thirteen of the complaint.

14.     Plaintiffs have exhausted any remedies that may be exist.

*Answer*:   Defendants deny the allegations contained in paragraph fourteen of the complaint.

5

WHEREFORE, Plaintiffs prays that the Court, in light of the foregoing:

A.    Compel Defendant and those acting under him to perform their duty to rule upon the Plaintiff's applications;

B.    Compel the Federal Bureau of Investigation to complete their background and fingerprint process.

B.    Grant attorney's fees and cost of court

C.    Grant such other and further relief as this Court sees proper under the circumstances.

*Answer*:    Defendants deny that plaintiff is entitled to any relief whatsoever, prays for judgment in their favor, with costs, and that the court award such further relief as may be appropriate.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:   s/ James M. Kuhn, Sr.
      JAMES M. KUHN, SR.
      Assistant United States Attorney
      219 South Dearborn, Room 500
      Chicago, Illinois 60604
      (312) 353-1877
      james.kuhn @ usdoj.gov

6

# Government Exhibit C

DECLARATION OF F. GERARD HEINAUER

F. GERARD HEINAUER, pursuant to 28 U.S.C. § 1746, declares the following:

1.  I am employed by the Department of Homeland Security ("DHS"), Citizenship and Immigration Services Division ("USCIS"), as the Director of the Nebraska Service Center ("NSC") in Lincoln, Nebraska.  It is in that capacity and based upon reasonable inquiry and my knowledge, information and belief that I provide this declaration.

2.  The Secretary for the Department of Homeland Security is a named defendant in the case <u>Abdallah El Sheikh and Rola El Sheikh v. Chertoff, et al.</u>, 08-1152, presently pending in the United States District Court for the Northern District of Illinois.  Plaintiff Abdallah El Sheikh is citizen of Lebanon assigned alien registration number A29 222 864, who seeks to have his pending Form N-400, Application for Naturalization, adjudicated.  Co-Plaintiff Rola El Sheikh's N-400 was approved and she was naturalized on June 4, 2008.  Therefore, this declaration will address only the pending N-400 application of Abdallah El Sheikh.



3.  Plaintiff filed his Form N-400 at the Nebraska Service Center on August 8, 2006.  The Form N-400 was assigned receipt number LIN*000940730 and remains pending.

4.  Plaintiff has been a lawful permanent resident (green card holder or "LPR") since October 9, 2001.

5.  Plaintiff should keep USCIS apprised of his current address for purposes of his naturalization application.

6.  General requirements for naturalization applications are that the applicant has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years; the applicant must be of good moral character and attached to the principles of the Constitution of the United States.  Most applicants are also required to establish, during an in-person interview, an understanding of the English language, and knowledge and understanding of the fundamentals of the history, and of the principles and form of government of the United States.  Finally, in order to be admitted to citizenship, the applicant must take an oath in a public ceremony renouncing his or her allegiance to any foreign state of which the applicant was before a subject or citizen, and swearing allegiance to the United States government.

7.  Congress requires completion of an FBI criminal background investigation of any applicant for naturalization before the application can be adjudicated by USCIS.  Plaintiff's background and security check has not been completed by the FBI.

8.  The attached Fact Sheet explains the different types of background and security checks relevant to the statutory requirement that a full criminal background check must be completed prior to adjudication of Form N-400.

9.  When an alien applies for naturalization, USCIS conducts several forms of security and background checks to ensure that the alien is eligible for the immigration benefit and that he or she is not a risk to national security or public safety.  In addition to records checks against DHS's own immigration systems, these background checks currently include (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies; and (c) an FBI name check, which

is run against FBI investigative databases containing
information that is not necessarily revealed by the
FBI's fingerprint check or IBIS.

10. These law enforcement checks have revealed significant
derogatory information on various alien applicants for
immigration benefits, including applicants seeking
naturalization, which has resulted in the alien being
found ineligible for the benefit and USCIS's denial of
the application.  Where applicable, the information has
also resulted in aliens being arrested by law
enforcement agencies or charged under removal grounds
and deported from the United States following a final
order of removal.  In many instances, the disqualifying
information on the alien has been discovered as a
result of the IBIS or FBI name checks, but it has not
been revealed by a fingerprint check alone.

11. Naturalization applications are filed at one of four
regional mail-in Service Centers.  The Service Center
receipts the application, obtains the relevant alien
registration file from the National Records Center, and
initiates the required background checks.  Once the
checks are complete, the applicant is scheduled by the
Service Center for an in-person interview in the USCIS
district office having jurisdiction over his place of

residence.  After the interview, and review of any subsequently filed evidence, the application is adjudicated by a district officer and, if approved, the applicant is then scheduled for the next available oath ceremony.

12. The oath ceremonies are generally performed in the lobby (outside of normal business hours) or another area of the district office; special ceremonies are sometimes scheduled in federal district court or at another public location (e.g., Fourth of July ceremonies in conjunction with local/city events).  Due to staffing and space limitations and various other duties and priorities, each district office can only accommodate a certain number of naturalization interview slots or oath ceremony attendees each month. During fiscal year 2006, the total number of persons naturalized by USCIS was 702,589.

13. Plaintiff suggests in the Complaint that his case has been "unreasonably delayed."  It is difficult to address Plaintiff's suggestion without a source or point of reference.  However, any publicly announced processing times only reflect cases that are considered to be within the control of USCIS.  Cases considered to be within USCIS control are defined as those which are

ready to be adjudicated. Cases outside the control of
USCIS, and therefore, not counted in the net backlog
include: cases that are pending law enforcement
security checks, naturalization test retakes,
naturalization candidates awaiting scheduling of a
judicial ceremony, and cases in which the applicant has
failed to respond to a request for additional evidence
needed to complete the adjudication.

14. Since 9/11, USCIS has submitted millions of name check
requests to the FBI, thus taxing that agency's
resources and creating a backlog in FBI's performance
of complete security checks. During the initial
submission period of December 2002 and January 2003,
USCIS submitted almost 3 million names to the FBI. As
of May 2007, USCIS reported 329,160 FBI name check
cases pending, including naturalization, asylum, and
adjustment of status application combined, with 31,144
FBI name checks pending more than 33 months.

15. Plaintiff's name check request was electronically
submitted to the FBI on August 15, 2006, approximately
one week after his Form N-400 was filed. The FBI
electronically acknowledged receipt of the name check
request on August 18, 2006. The name check remains
pending. Plaintiff's preliminary IBIS and fingerprint

checks have been completed.  The IBIS and fingerprint
checks may be refreshed prior to the interview or oath
ceremony.

16. There are four USCIS regional Service Centers
    throughout the United States, each of which has
    jurisdiction over certain applications and petitions
    filed by persons or companies within its respective
    geographic jurisdiction, and/or exclusive nationwide
    jurisdiction over other types of applications.  These
    Centers adjudicate cases on a mail-in basis only; they
    do not conduct in-person interviews.  The Nebraska
    Service Center accepts and processes naturalization
    applications from aliens living in 20 Midwestern and
    Northwestern states, including Illinois.

17. Of a total figure of 84,355 naturalization filings
    currently being processed at the Nebraska Service
    Center, there are approximately 21,728 awaiting
    responses on FBI name checks.  USCIS reports there were
    approximately 876,365 naturalization cases in total
    pending at Service Center and district offices by the
    end of fiscal year 2007.  An estimated number of
    191,046 of these pending naturalization applications
    are awaiting responses on FBI name checks.

18. Cases in which the pending FBI name check is the only
    impediment to final adjudication are audited on a
    weekly basis in order to identify those in which a
    response from the FBI has been received. Once the
    security checks are completed, the case can be
    forwarded to the district office for interview.

19. Service Centers have a process for expediting
    processing of certain applications and petitions.
    However, it is important to note that whenever a
    particular application or petition receives expedited
    processing and is moved up in the adjudications queue,
    it is at the expense of those still unadjudicated
    petitions or applications that bear an earlier filing
    date. If, for example, USCIS asks the FBI to expedite
    a case, this action comes at the expense of other name
    check cases, many of which have been pending since
    December 2002, because FBI would have fewer resources
    with which to work the other pending cases. USCIS is
    currently limited in the number of expedite requests
    that can be made to the FBI each week, and there is a
    backlog even in submitting the expedite requests for
    cases that have been deemed to meet expedite criteria.

20. In order to address in a consistent and fair manner the
    increasing number of mandamus actions filed nationwide

by aliens awaiting decisions on their petitions and applications, USCIS issued specific guidelines for requesting an expedited name check from the FBI. Expedited processing may be pursued in cases at USCIS's discretion for military deployment, age-out cases and applications affected by sunset provisions, significant and compelling reasons such as critical medical conditions, loss of social security benefits or other subsistence, severe financial loss, extreme emergent situation, humanitarian situation, nonprofit status of requesting organization in furtherance of the cultural and social interest of the United States, Department of Defense/National Interest requests from official U.S. government entity, USCIS error, or compelling interest of USCIS.

21. To my knowledge, Plaintiff has not made a formal request for expedited processing. Expedite requests are determined on a case-by-case basis. Plaintiff does not allege any specific damage in his complaint. Rather, Plaintiff alleges "unreasonable delay." Generally, as a single factor, this allegation does not constitute a special circumstance that would justify emergency or expedited processing.

22. Applicants for naturalization hold lawful permanent resident (LPR) cards ("green cards") which allow them to lawfully work in the United States and to return from travel abroad while their naturalization application is pending.

23. The Nebraska Service Center is processing Mr. El Sheikh's naturalization application in accordance with standard procedures.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Lincoln, Nebraska
on this 16th day of July, 2008.

F. Gerard Heinauer
Service Center Director
Nebraska Service Center

*Press Office*
**U.S. Department of Homeland Security**



**U.S. Citizenship
and Immigration
Services**

# Fact Sheet

April 25, 2006

## Immigration Security Checks—How and Why the Process Works

### Background

All applicants for a U.S. immigration benefit are subject to criminal and national security background checks to ensure they are eligible for that benefit. U.S. Citizenship and Immigration Services (USCIS), the Federal agency that oversees immigration benefits, performs checks on every applicant, regardless of ethnicity, national origin or religion.

Since 2002, USCIS has increased the number and scope of relevant background checks, processing millions of security checks without incident. However, in some cases, USCIS customers and immigrant advocates have expressed frustration over delays in processing applications, noting that individual customers have waited a year or longer for the completion of their adjudication pending the outcome of security checks. While the percentage of applicants who find their cases delayed by pending background checks is relatively small, USCIS recognizes that for those affected individuals, the additional delay and uncertainty can cause great anxiety. Although USCIS cannot guarantee the prompt resolution of every case, we can assure the public that applicants are not singled out based on race, ethnicity, religion, or national origin.

USCIS strives to balance the need for timely, fair and accurate service with the need to ensure a high level of integrity in the decision-making process. This fact sheet outlines the framework of the immigration security check process, explaining its necessity, as well as factors contributing to delays in resolving pending cases.

### Why USCIS Conducts Security Checks

USCIS conducts security checks for all cases involving a petition or application for an immigration service or benefit. This is done both to enhance national security and ensure the integrity of the immigration process. USCIS is responsible for ensuring that our immigration system is not used as a vehicle to harm our nation or its citizens by screening out people who seek immigration benefits improperly or fraudulently. These security checks have yielded information about applicants involved in violent crimes, sex crimes, crimes against children, drug trafficking and individuals with known links to terrorism. These investigations require time, resources, and patience and USCIS recognizes that the process is slower for some customers than they would like. Because of that, USCIS is working closely with the FBI and other agencies to speed the background check process. However, USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take.

**Immigration Security Checks—How and Why the Process Works**

### How Immigration Security Checks Work

To ensure that immigration benefits are given only to eligible applicants, USCIS adopted background security check procedures that address a wide range of possible risk factors. Different kinds of applications undergo different levels of scrutiny. USCIS normally uses the following three background check mechanisms but maintains the authority to conduct other background investigations as necessary:

- **The Interagency Border Inspection System (IBIS) Name Check—** IBIS is a multiagency effort with a central system that combines information from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns. USCIS can quickly check information from these multiple government agencies to determine if the information in the system affects the adjudication of the case. Results of an IBIS check are usually available immediately. In some cases, information found during an IBIS check will require further investigation. The IBIS check is not deemed completed until all eligibility issues arising from the initial system response are resolved.

- **FBI Fingerprint Check—**FBI fingerprint checks are conducted for many applications. The FBI fingerprint check provides information relating to criminal background within the United States. Generally, the FBI forwards responses to USCIS within 24-48 hours. If there is a record match, the FBI forwards an electronic copy of the criminal history (RAP sheet) to USCIS. At that point, a USCIS adjudicator reviews the information to determine what effect it may have on eligibility for the benefit. Although the vast majority of inquiries yield no record or match, about 10 percent do uncover criminal history (including immigration violations). In cases involving arrests or charges without disposition, USCIS requires the applicant to provide court certified evidence of the disposition. Customers with prior arrests should provide complete information and certified disposition records at the time of filing to avoid adjudication delays or denial resulting from misrepresentation about criminal history. Even expunged or vacated convictions must be reported for immigration purposes.

- **FBI Name Checks—**FBI name checks are also required for many applications. The FBI name check is totally different from the FBI fingerprint check. The records maintained in the FBI name check process consist of administrative, applicant, criminal, personnel and other files compiled by law enforcement. Initial responses to this check generally take about two weeks. In about 80 percent of the cases, no match is found. Of the remaining 20 percent, most are resolved within six months. Less than one percent of cases subject to an FBI name check remain pending longer than six months. Some of these cases involve complex, highly sensitive information and cannot be resolved quickly. Even after FBI has provided an initial response to USCIS concerning a match, the name check is not complete until full information is obtained and eligibility issues arising from it are resolved.

For most applicants, the process outlined above allows USCIS to quickly determine if there are criminal or security related issues in the applicant's background that affect eligibility for immigration benefits. Most cases proceed forward without incident. However, due to both the sheer volume of security checks USCIS conducts, and the need to ensure that each applicant is thoroughly screened, some delays on individual applications are inevitable. Background checks may still be considered pending when either the FBI or relevant agency has not provided the final response to the background check or when the FBI or agency has provided a response, but the response requires further investigation or review by the agency or USCIS. Resolving pending cases is time-consuming and labor-intensive; some cases legitimately take months or even

**Immigration Security Checks—How and Why the Process Works**

several years to resolve.  Every USCIS District Office performs regular reviews of the pending caseload to determine when cases have cleared and are ready to be decided.  USCIS does not share information about the records match or the nature or status of any investigation with applicants or their representatives.

# Government Exhibit D

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| ABDALLAH EL SHEIKH, ROLA EL SHEIKH, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No: 08 c 1152 |
| MICHAEL CHERTOFF, et al., | ) | |
| Defendants. | ) | |

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C.  I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am familiar with the name check requests for ABDALLAH EL SHEIKH and ROLA EL SHEIKH, the plaintiffs in this civil action.

GOVERNMENT
EXHIBIT
D
CARDBIS 800/783-0389

## NATIONAL NAME CHECK PROGRAM

(4)     The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)     The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

compiled for law enforcement purposes. This system consists of a numerical sequence of files broken down according to subject matter. The subject matter of a file may relate to an individual, organization, company, publication, activity, or foreign intelligence matter. Certain records in the system are maintained at FBI Headquarters. Records which are pertinent to specific FBI Field Offices are mostly maintained at those Field Offices.

(6)     FBI Headquarters and each Field Division can access the CRS through the FBI's General Indices. The General Indices are arranged in alphabetical order and consist of indices on various subjects, including the names of individuals and organizations. Only the information considered pertinent, relevant, or essential for future retrieval is indexed.

(7).    Communications directed to FBI Headquarters from various Field Offices and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals, groups, or organizations which are listed in the case captions or titles as subjects, suspects, or victims. Searches made in the index to locate records concerning particular subjects are made by searching the name of the subject requested in the index.

(8)     The entries in the General Indices fall into two categories:

(a)     "main" entries – entries that carry the name corresponding with the subject of a file contained in the CRS.

(b)     "reference" entries – entries (sometimes called "cross-references") that generally only mention or reference an individual, organization, etc., that is contained in a document located in another "main" file.

(9)     In 1995, the FBI implemented the Automated Case Support ("ACS") system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records were converted from automated systems previously utilized by the FBI. The ACS system

consists of the following three automated applications that support case management functions for all investigative and administrative cases:

(a) Investigative Case Management: This application provides the ability to open, assign, and close investigative and administrative cases as well as to set, assign, and track leads. A case is opened by the Office of Origin, which sets leads for itself and other field offices, as needed. The offices that receive the leads are referred to as Lead Offices. When a case is opened, it is assigned a Universal Case File Number, which is utilized by FBI Headquarters and all offices conducting or assisting in the investigation. Using fictitious file number "111-HQ-12345" as an example, an explanation of the Universal Case File Number is as follows: "111" indicates the classification for that specific type of investigation; "HQ" is the abbreviated form used for the Office of Origin of the investigation (in this case, FBI Headquarters); and "12345" indicates the individual case file number for that particular investigation.

(b) Electronic Case File: This application serves as the central electronic repository for the FBI's official text-based documents. It supports the universal serial concept, where only the creator of a document serializes it into a file, providing single source entry of serials into the computerized system. All serials originated by the Office of Origin are maintained in the Office of Origin's case file.

(c) Universal Index: This application, sometimes referred to as "UNI", continues the universal concepts of the ACS system by providing a complete subject/case index to all investigative and administrative cases. Only the Office of Origin is required to index. However, the Lead Offices may index additional information as needed. The Universal Index, which consists of an index of approximately 99.3 million records, functions to index names to cases, and to search names and cases for use in the FBI investigative and administrative cases. Names of individuals or entities are recorded with identifying information such as the date or place of birth, race, sex, locality, social security number, address, or date of event.

4

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters.  The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval.  Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved.  The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes.  Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index.  The searches seek instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference.  As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation.  For example, "references" include associates, witnesses, or conspirators.  Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery.  The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on.  The Program

5

application searches names phonetically against the Universal Index records and retrieves similar spelling variations (which is especially important considering that many names in our indices have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit," meaning that the system has stopped on a possible match with the name being checked. If a search comes up with a match to a name and either a close date of birth or social security number, it is designated an "Ident."

## RESOLUTION RATE

(13)    There are four stages involved in the completion of an individual name check: batch processing, name searching, dissemination, and file review. The first stage in the process, batch processing, involves the transfer of the name check requests from USCIS to the NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system and the names are electronically checked against the FBI's Universal Index (UNI). Recently, during the batch processing phase, approximately 66 percent of the name checks submitted by USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record" indicates that the FBI's Universal Index database contains no identifiable information regarding a particular individual. A "No Record" result returned to USCIS definitively concludes the name check process concerning that particular request. Duplicate submissions (i.e., identically spelled names with identical dates of birth and other identical information submitted while the original submission is still pending) are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

6

(14)   The second stage in the process is name searching.  For the name check request that are still pending after the initial electronic check, an expanded manual name search is required.  An FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information.  This secondary manual name search completed typically within 30-60 days historically identifies an additional 17 percent of the USCIS requests as having "No Record," for an approximate 83 percent overall "No Record" response rate.  The results of this 17 percent also are returned to USCIS.

(15)   The third and fourth stages in the process are dissemination and, if needed, file review.  (Prior to February 2008, the file review stage preceded the dissemination stage.  Because an increasing number of name check requests involve review of electronic records, and in an effort to improve efficiency, the FBI now uses the file review function in the back end of processing to locate paper records on an as needed basis.)  As noted, the remaining 17 percent of USCIS requests are identified as possibly being the subject of an FBI record.  Analysts in dissemination are responsible for reviewing and analyzing FBI records and providing results to customers.  If a record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly.  If not, however, the relevant information must be retrieved through the file review process from an existing paper record.  Once the information is retrieved, an analyst in dissemination reviews the records for possible derogatory information.  Less than one percent of USCIS's requests are identified with a file containing possible derogatory information.  If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

7

(16)    Apart from the aforementioned stages, a name check occasionally may undergo additional electronic or manual searches depending on the length of time the name check has been pending in the processing queue in the dissemination phase.  It is very common for a name check to remain pending in this final stage for an extended period because of the volume of earlier-filed name checks, as well as expedited name checks, that analysts must resolve.  During this period, a name check cannot be further processed until it is assigned to an analyst.  The additional searches thus are done to ensure that the analyst in the dissemination phase has up to date information prior to completing and disseminating a name check result.

(17)    At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol.  This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly.  However, if an applicant's name check requires a review of numerous FBI records and files, even though that name check request came in first, the name check may require additional time until all responsive records are located and reviewed.

(18)    The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis.  Based on its own criteria, USCIS determines which name checks are to be expedited.  Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(19)    Expedited service allows USCIS to allocate name checks toward its highest priorities and generally to minimize possible health and welfare harm to applicants that may arise while an application is pending.  However, the FBI limits the number of expedite

8

requests it will accept from USCIS consistent with available resources and personnel, as well as because only a limited number of applications can be expedited for the process to remain meaningful as too many expedited requests would merely reorder the queue and lead to no net benefit. Thus, as it does with most customers, the FBI limits USCIS to 100 expedite requests per week.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (32) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2007, the FBI processed in excess of 4 million name checks.

(22)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2007, 52% (~2,113,000) of the total incoming name checks were submitted by USCIS.

9

## USCIS NAME CHECK REQUESTS

(23)     In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. Because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(24)     In December of 2002 and January of 2003, based on a joint agreement between the FBI and the former INS, INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific individual who was the subject of the request, approximately 16 percent -- or over 440,000 -- resubmitted requests indicated that the FBI may have information relating to the subject of the inquiry. The FBI ultimately completed those 440,000 requests by the Spring of 2008.

10

(25)   There are numerous factors that have contributed to delays in the processing of name check requests, including the name check for plaintiff.  One is the volume of incoming name checks – the total volume of incoming name check requests combined with pending name check requests has historically outpaced the NNCPS's available resources to process this volume.  As it concerns submissions by USCIS, for fiscal year 2007, USCIS submitted approximately 2,113,600 name check requests, of which approximately 1,112,400 represented naturalization-related name checks and approximately 794,800 represented adjustment of status-related name checks.  As of the end of fiscal year 2007, the NNCPS had over 402,800 pending USCIS name check requests, of which over 167,000 represented naturalization-related name checks and over 197,900 represented adjustment of status-related name checks.

(26)   The number of "hits" on a name when it is reviewed may further contribute to a delay in processing a name check request.  A "hit" is a possible match with a name in an FBI record.  The number of times the name appears in FBI records correlates to the number of records which require review.

(27)   The processing of common names also contributes to a delay in processing a name check request.  The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on.  Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records.  Common names can often have more than 200 hits on FBI records.

11

(28)  The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(29)  Another contributing factor which was briefly mentioned earlier in this declaration is the expedited request. Processing an expedited case means that an employee is not available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(30)  The FBI is seeking a number of improvements to its process. Over the short-term:

(31)  NNCPS is continuing to develop the Name Check Dissemination Database ("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate preparation of reports to other Agencies, and provide avenues for future automation of the name check process.

12

(32)    NNCPS is partnering with other Agencies to provide contractors and personnel to process name checks.  For example, the FBI and USCIS have implemented a key initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name Check requests, that is, pending name check requests that have only one FBI file potentially identified with it that needs to be reviewed in order to process the request.  By applying contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the pending USCIS name check workload.

(33)    The FBI is using overtime to maximize productivity.  It is also in the process of hiring additional employees to fill current vacancies and has procured an employee development program to streamline the training of new employees, thereby significantly decreasing the amount of time needed before a new employee can begin to significantly impact the NNCPS workload.  The employee development program led to the development of a name check employee training manual.

(34)    NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database.  It is also building an Electronic Records System that allows for future automation of the name check process.

(35)    NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(36)    As a mid-term improvement, NNCPS is exploring technology updates to the name check process.  Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process.  The goal is to incorporate

13

analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(37)    As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations throughout the United States and the world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check services. Once in place, the FBI will be able to scale resources proportionally with workload demands – pending name checks will pay for themselves. Until recently, fees did not cover the basic costs of providing the service. The FBI procured services to conduct a study to determine an appropriate fee structure. The independent contractor hired to conduct the study has completed its work and the proposed fee structure is undergoing the Federal rulemaking process. Consistent with this process, on October 1, 2007, the FBI began charging increased fees up front on an interim basis.

(38)    The FBI cannot provide a specific time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited at the request of USCIS, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name

14

check; the volume of expedited name checks the analyst must process for, among others, military

deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such

as critical medical conditions, and loss of Social Security or other subsistence; the number of

"hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of

records from various Field Offices that must be retrieved, reviewed and resolved; and, more

generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary

software NNCPS utilizes to process name checks does not report where in the processing queue a

particular name check request may lie vis-à-vis other name checks.

      (39)   The FBI and USCIS have developed a joint business plan to address the

currently pending USCIS name checks. The plan forecasts the processing of name checks

depending on the age and the resources available to NNCPS now and proposed for the future.

Under the plan, NNCPS's current priority per USCIS is to focus on USCIS name checks pending

with the FBI for more than two years. Once those are completed, the NNCPS will redirect its

personnel resources to focus on USCIS name checks pending for more than one year. The

ultimate goal of the business plan is by June 2009 to process USCIS name checks at a level of

98% within 30 days or less of receipt. The remaining 2% represent the most difficult name

checks and require additional time to adequately complete. Notwithstanding, and absent

extraordinary circumstances, NNCPS hopes to process the remaining 2% of USCIS name checks

at a level of 100% within 90 days or less of receipt. Because name checks vary in their

complexity and time to process, this forecast is an estimate and may be reassessed as

circumstances dictate. While the FBI is sensitive to the impact of the delays in processing name

check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results.

(40)  When the name check is completed, the FBI provides the results to USCIS as quickly as possible. On occasion, depending on the results provided to USCIS by the FBI, USCIS may require additional followup and coordination with the FBI.

(41)  It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

## THE FBI DOES NOT PUBLICLY DISCLOSE NAME CHECKS RESULTS

(42)  Plaintiffs occasionally request access to the documents examined during their name checks. The FBI does not publicly disclose name check results or any underlying "hits" because to do so could alert plaintiffs and/or other individuals to the existence of pending investigations, thus potentially compromising those investigations, confidential sources or investigative techniques. Through channels developed in the FBI's name check process, the FBI discloses derogatory information only to USCIS before USCIS renders final decisions on applicants' petitions. Moreover, the FBI cannot confirm that name check results reveal a person is *not* the subject of an FBI investigative record, because a denial as to one person would imply that silence as to others should be taken as confirmation that they are of investigative interest.

## PLAINTIFF'S NAME CHECK REQUEST

(43)     The name check request for plaintiff ABDALLAH EL SHEIKH was received by the FBI from USCIS on or about August 18, 2006 and has not been completed. Plaintiff's name check is pending in the processing queue and the FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above.  The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

(44)     The name check request for plaintiff ROLA EL SHEIKH was received by the FBI from USCIS on or about August 18, 2006 and was completed on November 25, 2007. The FBI performed its check in response to USCIS's request in accordance with the procedures outlined above.  The results of the name check were forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _17th_ day of July 2008.


MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

17

# Government Exhibit E

*Office of the Chief Counsel*

**U.S. Department of Homeland Security**
20 Massachusetts Avenue, N.W.
Suite 4025
Washington, DC 20529

 **U.S. Citizenship and
Immigration Services**

April 25, 2008

# Memorandum

**TO:**    ALL CIVIL DIVISION CHIEFS
            UNITED STATES ATTORNEY'S OFFICE

**FROM:**    LYNDEN D. MELMED
                Chief Counsel

**SUBJECT:**    The USCIS-FBI Joint Plan for Eliminating Name Check Backlog

During the last several years, the amount of litigation against USCIS and the FBI has increased dramatically due to delays associated with completing name checks. Attached is the FBI-USCIS joint plan to eliminate the FBI name check backlog. The joint plan is the result of a cooperative effort by the executive leadership of both the FBI and USCIS. USCIS and OIL will soon provide a sample Motion for Summary Judgment which incorporates the information contained in the joint business plan to assist in your litigation efforts.

Under the joint plan, the FBI states that the USCIS name check backlog will be eliminated by June 2009, and the FBI will meet the USCIS target performance goal of processing 98% of all incoming name checks within 30 days and the balance within 90 days. The target for processing all USCIS name checks pending over one year is November 2008. USCIS has allocated substantial resources to enable the FBI to accomplish these goals, including more than $34.5 million for additional personnel and improvements to information technology.

With the release of the joint plan, which provides publicly-available target processing times for the oldest pending FBI name checks, government counsel will be in a stronger position to argue that courts should not bypass this joint plan or the agency's expedite criteria for individual plaintiffs or discrete classes of plaintiffs. Rewarding individuals who sue the government diverts limited resources from the oldest FBI name check cases and could compromise the FBI's ability to reach its target processing times.



# Federal Bureau of Investigation
## Records Management Division

National Name Check Program
Business Plan
for
United States Citizenship and Immigration Services

March 2008

# EXECUTIVE SUMMARY

This National Name Check Program (NNCP) Business Plan applies to name check services between the Federal Bureau of Investigation (FBI) and the United States Citizenship and Immigration Services (USCIS) and outlines a strategy for eliminating USCIS name check requests pending over 30 days, in addition to obtaining a steady state processing rate whereby most all USCIS name checks are completed within 30 days. The strategy as outlined reaches these goals by June 2009.

Because the steps required to meet these goals require commitment from both the FBI and USCIS, the FBI's Records Management Division (RMD), NNCP, is seeking Executive Management concurrence with the plan from the FBI and USCIS.

By signature, the undersigned convey that they have reviewed this Business Plan, are in agreement with this plan as a way forward to address the pending levels of USCIS name checks and are committed to provide the support as outlined herein to achieve the stated goals.


Timothy P. Murphy
Associate Deputy Director
Federal Bureau of Investigation


Jonathan R. Scharfen
Deputy Director
U.S. Citizenship and Immigration Services


John S. Pistole
Deputy Director
Federal Bureau of Investigation

i

## USCIS Name Checks Pending with the FBI

The Federal Bureau of Investigation's (FBI's) National Name Check Program (NNCP) is part of the Records Management Division (RMD). With a customer base of over 75 agencies, the NNCP researches and disseminates, in accordance with applicable laws, orders, rules and policy, information contained in the FBI's files in response to name check requests. In Fiscal Year (FY) 2007, the NNCP received over four million name check requests and also processed over four million name check requests (this number includes the residual work from the previous fiscal years). NNCP's largest customer is USCIS. In FY 2007, incoming name check work attributed to USCIS was 52% of all name check requests received (over 2.1 million), and 50% of all name checks completed (over 2.0 million). At the end of FY 2007, the NNCP had over 402,000 pending USCIS name checks.

## CURRENT CIRCUMSTANCES

### USCIS Name Check Data / Statistics

For FY 2008, as of March 5, 2008, the FBI has received 792,397 USCIS name check requests; completed 849,580 USCIS name check requests and is processing 345,635 USCIS name check requests. As compared to the same time in FY 2007, this level represents a 9.5% increase in incoming USCIS name check requests; an increase in completed USCIS name checks requests of 23%; and a decrease of pending USCIS name check requests of 13.4%.

The NNCP has its genesis as a paper-based process and still must rely partially on manual processing of name check requests. In the last few months, NNCP has significantly increased its production capacity in the most time intensive manual phases of the name check process through the acquisition and training of contract staff. This trend will continue to be fueled by the procurement of additional contractors. Increased production capacity combined with process improvements will continue to reduce pending levels until target goals are achieved.

The Chart below indicates the trends for USCIS over the past six FYs.



The chart shows an overall yearly increase of incoming USCIS name checks per FY since 9/11 and highlights the USCIS rerun where USCIS resubmitted 2.7 million name check requests over a five-week period from December 2002 – January 2003.

**Incoming Name Checks**

The table below shows the level of incoming name checks received in FY 2005 – FY 2007 and the amount forecasted for FY 2008 and FY 2009. The forecasted volume determines the staffing level described in the business plan.

| Fiscal Year | FY 2005 | FY 2006 | FY 2007 | FY 2008 | FY 2009 |
|---|---|---|---|---|---|
| USCIS | 1,514,076 | 1,633,349 | 2,113,672 | 1,899,990 | 1,558,012 |

**Personnel**

As of March 5, 2008, there are 251 employees and contractors working in support of processing USCIS name checks. This includes 40 FBI personnel in addition to 211 contractors jointly funded by the FBI and USCIS. Additionally, 10 more contractors are scheduled to come onboard by the end of March 2008, with 69 scheduled for June 2008 (of which 34 are supported by funding recently received by USCIS, with the remaining 35 to be funded under the execution of this Business Plan).

The time required to train a contractor to a full production level is approximately four months. Of the 211 contractors onboard as of March 5, 2008, 110 arrived onboard either during or before November 2007, and are working at full production. The remaining 101 contractors on board in February – March 2008 are not currently at full production capacity, and should reach full productivity by June – July 2008. The remaining 69 contractors scheduled for arrival in June 2008 should reach full productivity by October 2008.

Additionally, increased user fees have allowed the NNCP to increase the number of overall FBI staffing positions in FY 2008. Of the additional personnel the NNCP plans to hire, it is estimated that an increase of approximately 40 FBI personnel will be dedicated to processing USCIS name checks.

Lastly, the FBI is procuring additional contract expertise in the areas of Business Statistics/Risk Analysis, Financial Management, Information Technology (IT), and Production/Throughput. The addition of these skillsets will immediately, greatly enhance the FBI's ability to analyze data and reports. This will also allow the FBI to quickly develop and update business forecast models, assist in the planning and development of the financial aspect of the NNCP, allow greater concentration on business automation and execution of new IT systems, and enable intense focus on evaluating and implementing further ways to increase throughput. The FBI plans to use these business experts for one year with two option years. The long term goal is to hire or develop this expertise in-house so this contract support will no longer be required.

## PROJECT GOALS

### Development of Specialized Business Modeling Tools

In order to improve the NNCP's ability to forecast performance and timelines, the FBI funded the development of a business forecasting model, upon which the forecasts below are based. Because name checks vary in their complexity and time to process, forecasting production and estimating time to achieve goals can be a complex exercise. The procured model gives the FBI a solid, foundational baseline from which to make predictions. This model will not only increase the FBI's ability to more accurately forecast name check program performance, but also allows it to better define resource requirements and production rates required to meet any particular benchmark.

## Model Predictions

The NNCP forecast establishes a number of milestones based on the age of the pending work. The FBI defines project milestones as follows based on additional staffing:



## Final Goal:  Maintain USCIS name check processing at 98% within 30 days or less and 100% of all USCIS name checks processed in 90 days or less.

The Model and projections are based on current USCIS operational priorities as recently conveyed to the FBI. The USCIS priorities that are assumed in the model are as follows:

- Because of the USCIS's priority to focus on Naturalization pending name checks that were submitted to the FBI prior to May 2006, projections are based on focusing 80% of the available FBI personnel/contractor resources (not including resources dedicated to processing expedites) processing these cases, which by the FBI's count is approximately 29,800 name checks.
- Once these pre-May 2006 Naturalization Name Checks are completed, the personnel resources allocated to that project will be redirected to focus on the oldest pending name checks regardless of the case type.

## Review of Target Goals

Progress toward meeting the projected goals will be reviewed on a regular basis. As mentioned in the next section, first-line supervisors monitor metrics performance on a daily basis, with weekly reports to second-line supervisors, the Assistant Section Chief, and the Section Chief. Any operational adjustments required to meet projected goals will be conveyed to FBI and USCIS Executive Management. Monthly FBI and USCIS meetings will be held to review progress toward projected goals and any operational adjustments. Additionally, USCIS will be provided detailed reports on a biweekly basis summarizing Fiscal Year to date statistics regarding USCIS name checks.

## STEPS TO ACHIEVE PROJECT GOALS

### Improved Metrics Implementation

In order to maintain expected productivity and reach forecasted benchmarks, new employee performance-based metrics were developed to coincide with the production needed. The metrics were designed to be achievable while pushing employee performance with an incentive to perform at a higher level. Productivity rates to reach forecasted benchmarks according to the model average 0.77 name checks per hour per employee in the most difficult analytical phase of the name check process. The current contractual arrangements support this production rate with each contractor being required to process at a rate of 140 name checks per month. In addition to measuring average hourly production, metrics for oldest in queue, average processing time, and error rate will be examined. Constant review, feedback to the contractor or employee, and problem solving will be daily activities for first- and second-line supervisors.

Individual employees and supervisors are held accountable for performing in accordance with applicable metrics. First-line supervisors will monitor daily metrics to identify problem areas and provide employee/contractor feedback. Fluctuations in daily metrics may be substantial due to variances in the degree of difficulty in processing name checks. However, longer term 30-day averages will provide a reliable indication of an employee's production capability. First-line supervisors are held accountable for their individual team's performance, and will report weekly metrics to second-line supervisors at the Unit level who will review the report and make any additional inquiries or take corrective action as required to improve production.

Second-line supervisors at the Unit level are held accountable for Unit metric performance, and, after addressing any issues, will provide a weekly report to the NNCPS Assistant Section Chief, who is in charge of name check operations. The second-line supervisor's weekly report will provide production rates, relative change data, and supervisory comments. This information is important to demonstrate an employee's/contractor's improving or diminishing performance along with the first-line supervisor's insight. The NNCP Assistant Section Chief will review the reports with the second-line supervisors and provide direction as necessary to improve production.

The NNCP Assistant Section Chief is held accountable for NNCP Section metric performance regarding USCIS name check work, and will provide, at a minimum, a weekly report to the NNCP Section Chief containing a metric summary report, and a narrative analysis of the metrics, along with recommendations for improvement.

### Priority Workflow Management

The NNCP implemented new work queue management procedures will allow greater monitoring of work allocation relative to resources. This permits the prioritization of selected target areas for resource allocation, ensuring that the oldest cases are worked

first by contract staff. These targets are designated as "buckets," a pool of pending name checks from which analysts are required to draw when being assigned name checks to process.

Since the implementation of the work queues in November 2007, the number of USCIS name checks pending over four years has dropped from approximately 12,000 to under 3,000. By utilizing these tools, analysts are assigned the oldest cases first, thereby ensuring that the oldest cases are eliminated first. Projected name check reduction progress is annotated in the charts located in the Appendices of this Business Plan.

### File Review Workflow Modification

During FY 2008, NNCP has substantially changed the name check process. In FY 2007, incoming name checks progressed from the Batch phase where the names were electronically checked against the FBI's Universal Index, to the Name Search phase where the residual name checks were manually checked against electronically available information. From there, the names proceeded to the File Review phase, where paper records were located for a cursory manual review and scanning. In the final Dissemination phase, FBI files were analyzed with final results going back to the customer. Each phase could result in the elimination of pending name checks[1] with the results going back to the customer and the remaining name checks continuing to the next phase. For the 66% of the records accessed for name check purposes that are in electronic form, the File Review phase was simply a paper file chokepoint that increased queue times without adding value to the name check process.

Starting mid-January 2008, NNCP modified the process to move name checks from the Name Search phase directly to the Dissemination phase and designated the Dissemination phase as the point where paper records are reviewed. Currently, analysts in Dissemination request File Review/Scanning services as required in order to process name checks needing information contained in paper files. This workflow modification allows review of exactly the same paper files as before the change while providing a moderate increase in productivity levels and reducing queue times.

### Additional Name Check SubProcess Improvements

Name check analysts can categorize the name checks they process into two groups: those requiring external action, and those not requiring external action. Name checks requiring an external action – e.g., files from the field or liaison with other divisions – require more effort and, therefore, have a lower production rate. The FBI has established special teams

---

[1] All name checks are processed against the FBI's Universal Index to identify matches to possible information in FBI files. Most checks do not result in a match, so the name check is completed at that point. Each name check receiving a "hit" on one or more possible files is then refined and evaluated in a multistage process. Each stage may resolve all possible file matches for a given name check, so the name check request becomes complete at that stage.

to address these name check subprocesses, so analysts can concentrate their time on higher production rate work – those not requiring external action. External action falls into two main categories, those requiring retrieval of files from other divisions, and those requiring liaison with other divisions. Special teams for each subprocess will allow analysts to concentrate on work that is more productive.



*New File Review Process and Special Teams Supporting Name Check Subprocesses*

**FBI IT Support**

Because the FBI's primary name check data resides on the FBI's mainframe computer database, access to ad hoc reporting is limited and time consuming. To assist in the reaching of project goals, the FBI IT Operations Division (ITOD) will work to identify an alternative methodology resulting in greater access to the data allowing for the expedited running of reports and results required for projected name check filter analysis. Name check representatives will work with ITOD staff in providing specific IT reporting requirements needed.

**LABOR CAPACITY BOUNDARIES**

The program enhancements and initiatives outlined in this business plan will quickly and substantially improve NNCP production capacity and efficiency. However, there are practical labor capacity boundaries that must be considered when increasing production capacity.

7

## Ramp-up Time

The time to complete financial transfers, process contracting actions, hire cleared contract staff, and put workers through the four-month training program are the primary issues impacting ramp-up time for contractor staff. As delineated in this business plan, the last group of contractors is estimated to arrive in June 2008. Given the necessary four-month training time, these resources will not reach full productivity until October 2008, approximately halfway through the project.

## Technical Supervision of Contract Staff

The business plan is highly dependent upon contract staff. However, these new resources are not autonomous and require experienced FBI staff to train, evaluate, guide, and provide technical supervision and approvals. The plan establishes an FBI reviewer to contractor ratio of about 1 to 15. Several of the supervisory activities are inherently governmental, especially where the release of information to other agencies is concerned. Expanding the contract staff beyond the indicated levels, while possible, will place an additional burden on the already overleveraged FBI staff.

## Infrastructure and Supporting Service Limitations

The FBI is using two RMD sites for this project: the Interim Central Records Complex and an FBI off-site location in Washington, DC. The spaces are being fully leveraged, with multiple shifts already initiated. The FBI must support the increased staffing levels with various support services, *i.e.*, computers, networks, supplies, security, scanning, file services, etc. RMD's ability to provide the supporting infrastructure and services will limit future contractor staffing increases.

## Contractor Overtime Support

The FBI will also focus on utilizing contractor staff on an overtime basis. Out of the three contracting companies currently utilized under the blanket purchase agreement, only one company allows for contractor overtime. The FBI is currently negotiating with this company regarding overtime rates that will directly affect both the cost of contractor overtime and the overall reduction of pending USCIS name checks.

## FINANCIAL REQUIREMENTS

To date, the combination of USCIS user fees, capital investment from USCIS, and capital investment from the FBI has funded over 250 contractors and will allow an increased level of FBI full-time employees supporting USCIS to over 80.

To accomplish the milestones outlined in this business plan, an additional capital investment of $15 million is needed. Of this amount, $2 million is required as soon as possible to partially fund an additional 35 contractors, and the remaining $13 million is needed by July 1, 2008. The $15 million will support the following initiatives:

| Total Investment from USCIS | $15,000,000.00 |
|---|---|
| Contractor Establishment of Production Metrics | $71,000.00 |
| Contractor Production Throughput Experts – 1 Year | $1,251,120.00 |
| Additional 35 Contractors – 1 Year | $4,095,000.00 |
| Exercise Option Year 1 on Contract Effort 2 – 72 contractors for 1 Year | $9,000,000.00 |
| Additional Overtime* | $582,880.00 |

* The Additional Overtime is for use by Name Check employees in addition to contractor overtime.

Any delay or lack of funding as described above will significantly impact NNCP's ability to meet the end goal and will require a reassessment of projections. To that end, the FBI Finance Division, in concert with RMD, will need to work closely with the USCIS's Office of the Chief Financial Officer to insure that fees regarding the processing of USCIS name check requests are expeditiously billed and collected. The expeditious facilitation and handling of all capital investment from USCIS are also required to make funding readily available for expenditure as soon as possible for NNCP operational use.

# APPENDICES

### A. Name Check Projected Production Charts

The following charts represent performance estimates and achievements of project milestones.



The charts show the total number of name checks pending for the parameters of each milestone. Estimates are predicated on current incoming volume projections, funding, and contractor arrival times. The project will continue until the final milestone is reached in **June of 2009.**

The term "bucket" is used to designate a restricted pool of pending USCIS name checks from which analysts must draw when obtaining new work, *e.g.*, name checks submitted in 2002 or 2003. This allows a focused management prioritization of work queues, insuring that the oldest name checks are worked first. An analyst can only move to another bucket containing newer name checks when all name checks in the older bucket to which the analyst is assigned are either completed or all assigned.

The only general exception to this rule is that expedites are worked as requested by USCIS, regardless of the age of the expedited name check request.



- Target for processing all the 29,800 naturalization name checks older than May 1, 2006 is May 2008.



- Target for processing all USCIS name checks pending over four years is March 2008.



- Target for processing all USCIS name checks pending over three years is May 2008.



- Target for processing all USCIS name checks pending over two years is July 2008.



- Target for processing all USCIS name checks pending over one year is November 2008.



- Target for processing all name checks over 180 days is February 2009.

14



- Target for processing all name checks over 90 days is May 2009.



- Target for processing 98% of name checks over 30 days is June 2009.
- **From this point going forward, 98% of all USCIS name checks will be processed within 30 days. The remaining 2% represent the most difficult name checks and require additional time to adequately complete. Notwithstanding, this remaining 2% will be processed within 90 days or less of receipt.**

## B. NNCP Funding Plan for Contractors

| | FY 07 QTR 4 | | | FY 08 QTR 1 | | | QTR 08 2 | | | QTR 08 3 | | | QTR 08 4 | | | FY 09 QTR 1 | | | FY 09 QTR 2 | | | FY 09 QTR 3 | | | FY 09 QTR 4 | | | FY 10 QTR 1 | | | QTR 10 2 | | | QTR FY 10 3 | | | FY 10 QTR 4 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep |
| FBI Employees | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 54 | 54 | 59 | 59 | 59 | 59 | 59 | 59 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 |
| **Contractors Funded by User Fees** | | FY 2008 User Fee | | | | | | | | | | | | | FY 2009 User Fee Funding | | | | | | | | | | | | | | FY 2010 User Fee Funding | | | | | | | | | | | |
| | | 80 | 111 | 111 | 111 | 111 | 111 | 111 | 275 | 111 | 111 | 111 | 111 | 111 | 111 | 111 | 111 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 |
| **Contractors Funded by Capital Investments** | FBI Funded | | | | | | | | | USCIS Funding - $4,000,000 | | | | | | | | USCIS Funding - $9,000,000 | | | | | | | | | | | | | | | | | | | | | |
| | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | 38 | | | | | | | | | | | | | | | | | | |
| | | | | $3mil FBI Funded and $9mil USCIS Funding | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | 72 | | | | | | | | | | | | | | |
| | | | | | | | | | | USCIS Funding - $8,070,000 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | | | | | | | | | | | | | | | | | | |
| Total On-board | 68 | 68 | 68 | 140 | 140 | 140 | 220 | 220 | 275 | 349 | 349 | 349 | 349 | 349 | 359 | 359 | 359 | 299 | 299 | 299 | 299 | 299 | 192 | 192 | 192 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 | 120 |

Note: Extension of existing contracts funded by capital investments are dependent on level of USCIS funding received. The FBI employee counts above do not include supervisory personnel. In June 2009, 120 FTEs (not including supervisory personnel) will be needed to process the projected level of incoming name checks.

**Legend**

| | |
|---|---|
| Funded | |
| To be Funded | |

1